Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN, SWAN VIEW COALITION, ALLIANCE FOR THE WILD ROCKIES, and NATIVE ECOSYSTEMS COUNCIL. | CV- |
| Plaintiffs, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| vs. | |
| RICH KEHR, U.S. Forest Service Swan Lake District Ranger, CHIP WEBER, U.S. Forest Service Flathead National Forest Supervisor, LEANNE MARTEN, U.S. Forest Service Region One Forester, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture. | |
| Defendants. | |

## I. INTRODUCTION

1.  This is a civil action for judicial review under the citizen suit provision of the Administrative Procedure Act of the U.S. Forest Service's (Forest Service) authorizations, analyses, and lack thereof on the Flathead National Forest (Forest) related to and regarding the Beaver Creek Project (Project).

2.  Plaintiffs Friends of the Wild Swan, Swan View Coalition, Native Ecosystems Council, and Alliance for the Wild Rockies attest that the decisions approving the challenged authorizations, analyses, and lack thereof are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' actions or omissions violate the National Environmental Policy Act (NEPA), 42 U.S.C. 4331 *et seq.*, the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

4.  Plaintiffs request that the Court set aside the Project pursuant to 5 U.S.C. § 706(2)(A) and enjoin implementation of the Project.

5.  Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

## II.  JURISDICTION

6.    This action arises under the laws of the United States and involves the United

States as a Defendant. Therefore, this Court has subject matter jurisdiction

over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331,

1346.

7.    An actual controversy exists between Plaintiffs and Defendants.  Plaintiffs'

members use and enjoy the Flathead National Forest for hiking, fishing,

hunting, camping, photographing scenery and wildlife, and engaging in other

vocational, scientific, spiritual, and recreational activities.  Plaintiffs'

members intend to continue to use and enjoy the area frequently and on an

ongoing basis in the future.

8.    The aesthetic, recreational, scientific, spiritual, and educational interests of

Plaintiffs' members have been and will be adversely affected and irreparably

injured if Defendants implement the Project.  These are actual, concrete

injuries caused by Defendants' failure to comply with mandatory duties under

NFMA, NEPA, and the APA. The requested relief would redress these

injuries and this Court has the authority to grant Plaintiffs' requested relief

under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

9.    Plaintiffs submitted timely written comments and objections concerning the

Project in the available administrative review process, thus they have

exhausted administrative remedies.  Therefore, the Court has jurisdiction to review Plaintiffs' APA claims.

## III. VENUE

10. Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1). Defendant Kehr resides within the Missoula Division of the United States District Court for the District of Montana.

## IV. PARTIES

11. Plaintiff FRIENDS OF THE WILD SWAN is a non-profit conservation organization dedicated to the conservation of water quality, fish and wildlife habitat on the Flathead National Forest.  Its members use the Swan Valley for recreation, wildlife viewing, photography, research, aesthetic enjoyment, foraging, fishing and other activities.  Friends' office is in Swan Lake, Montana. Friends are concerned that more industrial logging projects like this one will adversely affect wildlife habitat in this already fragmented area, adversely affect its members interests and violate a number of laws.

12. Plaintiff SWAN VIEW COALITION is a non-profit conservation organization dedicated to conserving water quality and quiet, secure habitats for fish, wildlife and people on the Flathead National Forest and greater Flathead River Basin. Its members use these areas, including the Project area, for recreation, employment, wildlife viewing, photography, research,

education, aesthetic enjoyment, spiritual rejuvenation, and other activities. The Coalition's office is located in Kalispell, Montana. Its members are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project. The Coalition brings this action on its own behalf and on behalf of its adversely affected members.

13. Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Flathead National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Flathead National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

14. Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish,

and animal life, and its naturally functioning ecosystems.  Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana.  Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Flathead National Forest.  Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

15. Defendant RICH KEHR is the District Ranger for the Flathead National Forest Swan Lake Ranger District, and in that capacity is charged with ensuring that decisions made on the Swan Lake Ranger District are consistent with applicable laws, regulations, and official policies and procedures.

16. Defendant CHIP WEBER is the Flathead National Forest Supervisor, and in that capacity is charged with ensuring that decisions made on the Flathead National Forest are consistent with applicable laws, regulations, and official policies and procedures.

17. Defendant LEANNE MARTEN is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged

with ultimate responsibility for ensuring that decisions made at each National

Forest in the Northern Region, including the Flathead National Forest, are

consistent with applicable laws, regulations, and official policies and

procedures.

18.    Defendant UNITED STATES FOREST SERVICE (Forest Service) is an

administrative agency within the U.S. Department of Agriculture, and is

responsible for the lawful management of our National Forests, including the

Flathead National Forest.

## V.  FACTUAL ALLEGATIONS

19.     The Forest Service Biological Assessment for the Project is dated August 9,

2016.

20.    The Biological Opinion for the Project from U.S. Fish and Wildlife Service is

dated August 10, 2016.

21.    The Forest Service signed the Decision Notice authorizing the Project

December 14, 2016.

22.    The agency chose to implement a mixed alternative for the Project, which

includes elements of both action alternatives (Alternative 2 and Alternative 3)

discussed in the Environmental Assessment for the Project.

PROJECT AREA & ACTIVITIES

23.    The Project area is located on the Swan Lake Ranger District of the Flathead

National Forest in Missoula County, Montana.

24.   The Project area includes the eastern shore of Lindbergh Lake, the headwaters of the Swan River, portions of the Mission Mountain Wilderness, and a southern boundary defined by Sunset Ridge,which is adjacent to the Seeley Lake District of the Lolo National Forest.

25.   The Project area covers approximately 34,962 acres.

26.   The Project authorizes commercial logging on 1,865 acres, and non-commercial logging on 1,023 acres.

27.   The Project will produce 9.2 million board feet of wood products.

28.   The Project authorizes prescribed burning on 1,777 acres, with approximately 1,104 acres occurring within the Mission Mountain Wilderness.

29.   The Forest Service estimates that Project implementation will take five years.

30.   The Project also assigns management direction to approximately 5,457 acres of former Plum Creek Timber Company lands that are now owned and managed by the Forest Service.

31.   The Project will also install one fish barrier, upgrade one bridge, and install or replace three culverts.

32.   The Project authorizes 5.5 miles of temporary road construction for log-hauling.

33.   The Project also authorizes the opening and use of 52 miles of currently gated

or bermed roads.

34.   The Project also proposes to decommission 4.5 miles of system road and place 12.6 miles of system road into "intermittent stored service" after the other Project activities are complete.

35.   The Project is "financially inefficient" and will result in a net loss to the Forest Service, and the federal taxpayer, of $928,000.00 - $958,000.00.

GRIZZLY BEAR

36.   The grizzly bear is listed as a threatened species under the Endangered Species Act.

37.   Grizzly bears are present on the Flathead National Forest.

38.   The Project area is located in the southern portion of the Northern Continental Divide Ecosystem (NCDE) Grizzly Bear Recovery Zone.

39.   The Project area is within the Buck Holland and Beaver Creek Bear Management sub-units.

40.   The Project is located on lands that have been designated as Management Situation 1 (MS-1) for grizzly bears. Management Situation 1 lands are identified as areas needed for the survival and recovery of the species.

41.   The Project is located within the Swan Valley Grizzly Bear Conservation Agreement area.

42.   Grizzly bears are known to be present in both sub-units.  Reliable visual

sightings have occurred and information on radio-collared grizzly bears has been collected.

43.   The Project area does not meet the minimum habitat thresholds necessary for grizzly bears, known as 19/19/68, which require no more than 19% of a sub-unit to have open motorized route density over one mile/square mile, no more than 19% of a sub-unit to have total motorized route density over one mile/square mile, and no less than 68% core habitat in a sub-unit.

44.   The Beaver Creek sub-unit currently is 6/26/66, which does not meet total motorized route density or security core requirements.

45.   The Buck Holland sub-unit currently is 24/41/40, which does not meet open motorized route density, total motorized route density, or security core requirements.

46.   FWS finds: "The existing, ongoing access condition is likely resulting in adverse effects to grizzly bears."

47.   During the Project, the Project will increase open motorized access route density over one mile/square mile to 30% of the Buck Holland sub-unit and 31% of the Beaver Creek subunit.

48.   During the Project, the Project will increase total motorized route density over two miles/square mile to 28% of the Beaver Creek subunit.

49.   During the Project, the Project will decrease security core to 65% in the

Beaver Creek subunit.

50. FWS finds: "In addition to the adverse effects to grizzly bears presented by the baseline access conditions in the Beaver Creek and Buck Holland subunits, the proposed project will also result in adverse effects to bears."

51. FWS finds: "The proposed Beaver Creek project may result in adverse effects to grizzly due to temporary increases in road densities within the Beaver Creek and Buck Holland subunits. Additionally, the project may also result in adverse effects to grizzly bears from a temporary decrease in security core habitat within the Beaver Creek subunit."

52. Project prescribed burning operations will include low-altitude helicopter use in grizzly bear security core areas to ignite the burns and some bears may be displaced by helicopter activity and burning.

53. The Project will displace grizzly bears in both the Beaver Creek and Buck Holland subunits.

54. Displacement of bears may occur due to mechanical/motorized activity and crew activities. Potential displacement would last for the length of the proposed sale activity (5 years).

55. The Beaver Creek sub-unit is designated by the Swan Valley Grizzly Bear Conservation Agreement to be "inactive" from 2018 through 2023.

56. The Swan Valley Grizzly Bear Conservation Agreement defines "inactive" to

mean "those BMU subunits in which the Parties are not conducting

Commercial Use activities."

57.     The Swan Valley Grizzly Bear Conservation Agreement defines "commercial

use" as "major forest management activities by Plum Creek, Forest Service,

or DSL including, without limitation, road construction, road reconstruction

and timber harvest, but does not include Salvage Harvest."

58.      The Swan Valley Grizzly Bear Conservation Agreement defines "salvage

harvest" as "short term activities to harvest dead or dying trees resulting from

fire, disease, blowdown or the like and shall not continue for periods of more

than two consecutive weeks or for more than 30 days in the aggregate during

a given calendar year in the non-denning period (April 1 to November 15)."

59.      The Swan Valley Grizzly Bear Conservation Agreement defines

"administrative use" as use associated with "timber sale layout, road location,

precommercial thinning, road maintenance, tree planting, slash disposal, and

Salvage Harvest, but shall not include Commercial Use" and "minor actions

such as bough and post and pole harvest that are less than two consecutive

weeks in duration."

60.     The Project will allow activities to occur in the Beaver Creek sub-unit during

the "inactive" period.  Specifically, the Forest Service states:

"pre-commercial thinning, road maintenance, tree planting, slash disposal and

Salvage Harvest, may still occur when the subunit is inactive." The Forest Service also states: "The units that have been determined to meet the salvage criteria for the Selected Alternative, include; 1, 3, 5, 6, 7, 12, 16, 19, 21, 25, 28, 32, 34, 36, 39, 40, 45, 51, 55, 57, 59, 62, 83, 89, 99, 100, 102, 105, 114, 116, 118, 200, 203, 204, 231, 235, 252, 259, 260, 263, 264, 265, 267, 268, 269, 419, 429, 449, and 459. Totaling approximately 1,867 acres of treatment. Salvage activities for these units may occur during the maximum 30 day period between June 15 and August 31."

61. The Forest Service represents that "[d]ead and dying insect killed trees exist in some of the proposed units" and therefore it has recategorized the commercial activities in the Project area as "salvage harvest" if a unit contains "a dead or dying tree component from insects . . . ."

62. Neither the term "component" nor "insect" is part of the definition of salvage harvest in the Swan Valley Grizzly Bear Conservation Agreement.

63. After Project implementation, the Buck Holland sub-unit will not meet any of the 19/19/68 requirements. Post-project status will be 24/37/40. Nonetheless, FWS states: "Road decommissioning and ISS treatments would improve access conditions (TMARD) in the Buck Holland Subunit."

64. Despite failing 19/19/68 before and during Project implementation, FWS states that post-Project, the Beaver Creek subunit will comply with 19/19/68

and that "[p]ost project improvements to access conditions in the Beaver Creek subunit are a result of road storage and/or decommissioning." More specifically, FWS states that "Road decommissioning and ISS treatments would result in the Beaver Creek subunit meeting the Amendment 19 numerical objectives for OMARD, TMARD and security core upon project completion."

65. If the 12.6 miles of "road storage," i.e. intermittent stored service roads, are not deducted from total motorized route density calculations, after Project implementation, the Beaver Creek sub-unit would not meet 19/19/68.

INTERMITTENT STORED SERVICE ROADS

66. As discussed above, the Project proposes to place 12.6 miles of system road into "intermittent stored service" after the other Project activities are complete.

67. "Intermittent stored service (ISS) roads are Maintenance Level (ML) 1 roads closed to motorized traffic that are placed in a self-maintaining condition."

68. "Treatment activities can include recontouring the road entrance, removing culverts, restoring stream crossings and natural drainage patterns, out-sloping the road surface, installing water bars, and seeding and fertilizing the roadbed. The road prism remains on the landscape and on the National Forest Road System for future use."

13

69.   Maintenance Level 1 "is reserved for closed roads that can have any drivable

surface but are not open for any use unless needed for project work or

emergencies."

70.   Maintenance Level 1 roads have the following attributes: (1) They are in a

period of storage between intermittent uses for periods exceeding 1 year; (2)

They are not designated for motor vehicles as a road and not shown as a road

on the motor vehicle use map; (3) They may be managed and designated as a

motorized trail and shown on motor vehicle use maps as a motorized trail; (4)

They may be available and suitable for nonmotorized uses; (5) As a road,

motor vehicular traffic is prohibited, including administrative motor vehicle

traffic; (6) The road entrance is physically blocked or disguised; (7) Emphasis

is given to maintaining drainage facilities and runoff patterns; (8) Culverts

may be removed; (9) Basic custodial maintenance is performed to prevent

damage to adjacent resources and to perpetuate the road for future resource

management needs; (10) Planned road deterioration may occur; (11) Route

markers should be installed but need not be visible from an open road at the

entrance; (12) No road maintenance other than a condition survey may be

required if no potential exists for resource damage.

71.   Maintenance Level 1 roads have the following prescription guidelines:  (1)

Traveled way and shoulder - Generally, no work is required; (2) Drainage -

Drain as necessary to keep drainage facilities functional and prevent

unacceptable environmental damage. Culverts and fills may be removed; (3)

Roadway - Perform only that work needed to facilitate restoration of the

roadway for future use and to alleviate erosion or sedimentation on or from

the roadway or roadsides. Defer the removal of brush and trees from the

roadway until the road is opened for traffic at a future date. Repair slides and

slumps only if potential for loss of road investment or environmental damage

is determined to be at an unacceptable risk. Motor vehicle traffic is not a

consideration; (4) Roadside - Generally, no work is required; (5) Structure -

Repair only those items that cannot be deferred, and that are necessary to

protect investment and preserve structural integrity; (6) Traffic service -

Physically block roadway with a barrier other than a gate. Ensure that

physical closure devices and/or appropriate signing are in place and are

functional at the road entrance. Install and maintain route markers so that

National Forest System roads are clearly identified for administrative

purposes. Defer the maintenance of all other signs within the closure until the

road is opened. Consider removing signs if road is planned for a storage

period of more than 5 years. Correct deferred maintenance items prior to

opening the road to traffic.

72.    The following photographs are examples of "Maintenance Level 1" roads:

15







73.    Table A1-7 in the Project Decision Notice discloses the specific treatment

prescription for each road that will be converted to "intermittent stored

16

service" status in the Project area.

74.     According to Table A1-7 in the Project Decision Notice, at least 8 miles of

the roads to be converted to intermittent stored service will still be passable to

motorized or non-motorized use immediately following Project

implementation:

| Road # | Length | Existing Condition | Treatment Prescription |
|--------|--------|--------------------|------------------------|
| 9570 | 0.715 | Currently has culverts | "Remove stream-aligned culverts. Construct water bars as needed." |
| 10589 | 1.450 | Currently barriered | Road will be used for log-hauling. "Remove stream-aligned culverts. Construct water bars as needed after haul." |
| 9658 | 0.878 | Currently "moderately overgrown." | Road will be used for log-hauling. "Remove stream aligned culverts. Construct water bars as needed after haul." |
| 10590 | 0.900 | Currently "impassable due to vegetation." | Road will be used for log-hauling. "Remove 24-inch stream-aligned culvert at MP 0.160. Construct water bars as needed after haul." |
| 10737 | 0.6780 | Currently "impassable after junction with the Jocko Trail #34 due to vegetation. | Road will be used for log-hauling. "Barrier needed before junction with Jocko Trail #34." "Construct water bars as needed after haul." |

| 10739 | 0.391 | Currently "impassable after junction with the Jocko Trail #34 due to vegetation." | Road will be used for log-hauling. "Barrier needed before junction with Jocko Trail #34." "Construct water bars as needed after haul." |
|---|---|---|---|
| 10742 | 0.610 | Currently "impassable/ overgrown with vegetation starting just before removed culvert." (0.4 miles not impassable) | "Barrier needed at MP 0.440/Jct. with NFS road #10745. No work needed past culvert removal at MP 0.839. Construct water bars as needed." |
| 10745 | 0.250 | Currently "impassable due to culvert removal at MP 0.027." (0.027 not impassable) | "Barrier needed at junction with NFS road #10742. No other work anticipated." |
| 11646 | 0.250 | Currently "Intermittent stream crossing at MP 0.123 has been removed." | Road will be used for log-hauling.  "Barrier needed at junction with NFS road #10735. Install crossing at MP 0.123 and remove after haul." |
| 11647 | 0.740 | Currently "Intermittent stream crossing at MP 0.203 has been removed." | "Barrier needed at junction with NFS road #10735." |
| 90131 | 0.450 | "Road is currently passable." | "Remove stream-aligned culverts. Construct water bars as needed." |
| 91203 | 1.558 | "Road is currently passable." | "Construct water bars as needed.". |

| 9570Y | 1.026 | "MP 0.730 – 1.570 placed in ISS in 2010 as part of the Beaver Creek TMDL Project". (Thus, only 0.186 miles is actually new ISS road) | "Existing stream-aligned culvert at MP 0.580. Construct water bars as needed." |
|---|---|---|---|

75.    The segments of roads 9658, 10590, 10737, 10739, 10742, and 10745 that are proposed for intermittent stored service will first be cleared and used for log-hauling for the Project.

76.    The  roads to be converted to intermittent stored service in the Project area will not be fully recontoured, fully covered in natural debris in a manner that precludes all motorized or non-motorized use, or fully planted with shrubs and trees in a manner that precludes all motorized or non-motorized use immediately after Project implementation.

LYNX

77.    The Canada lynx is listed as a threatened species under the Endangered Species Act.

78.    Lynx are known to be present within the Beaver Creek Project area and multiple sightings have been documented that confirm this occurrence.

79.    Carnivore surveys in the Swan Valley have consistently detected lynx in both the Upper and Lower Beaver Lynx Analysis Units.

80.    The Project area is within lynx Critical Habitat Unit 3.

81.    The Unit 3 Critical Habitat area is essential to the conservation of lynx because it appears to support the highest density of lynx populations in the Northern Rocky Mountain region of the lynx's range. It also likely acts as a source for lynx and provides connectivity to other portions of the lynx's range in the Rocky Mountains.

82.    All of the proposed activities for the Project are located in lynx critical habitat.

83.    The Project area falls within two Lynx Analysis Units: Upper Beaver and Lower Beaver.

84.    The best available science on lynx habitat needs for reproductive success is the Kosterman Thesis.

85.    The Kosterman Thesis finds that young regenerating forest should occur only on 10-15% of a female lynx home range, i.e. 10-15% of a lynx analysis unit.

86.    The Project will increase unsuitable early stand initiation habitat above 15%.

87.     The Biological Assessment finds that in the Lower Beaver Lynx Analysis Unit, the Project will increase early stand initiation (i.e. unsuitable) habitat from 10% to 17%.

88.    The Biological Assessment finds that in the Upper Beaver Lynx Analysis Unit, the Project will increase early stand initiation (i.e. unsuitable) habitat

from 13% to 16%.

89.　Kosterman also found that at least 50% of a female home range, i.e. a lynx

analysis unit, should be conserved as mature forest.

90.　In the Lower Beaver Lynx Analysis Unit, the Project will decrease mature,

multistoried habitat from 35% to 33%.

91.　The Project is likely to adversely affect lynx.

92.　The Project is likely to adversely affect lynx critical habitat.

ELK

93.　Elk are a management indicator species on the Flathead National Forest.

94.　In its comments on the Project, Plaintiffs stated: "The Forest Plan requires

that the Forest Service maintain open road density at less than 1.0 mile/square

mile or less in moist sites in elk summer habitat. The Environmental

Assessment did not address this requirement or demonstrate compliance with

it."

95.　In response, the Forest Service stated: "The EA discusses elk moist sites,

road density and location within the project area (EA, p. 420-421)."

96.　The Beaver Creek EA includes one paragraph that mentions moist sites:

"Within summer and fall months elk favor habitat that includes moist sites

associated with particular forest habitat types as well as meadows and

riparian areas. Moist sites are defined by Lyon et al. (1985). The Flathead

Forest Plan includes direction that elk summer habitat will be managed 'in accordance with moist site and security area recommendations from Coordinating Elk and Timber Management, Final Report of the Cooperative Elk-Logging Study, 1970-1985' (Lyon et al. 1985). This report recommends high priority road closures for elk habitat through "wet meadows and moist areas." Moist areas defined by Lyon et al. (1985) include Abies lasiocarpa/Clintonia uniflora, Picea Engelmanii/Clintonia uniflora, Abies lasiocarpa/Menziesia ferruginea and Abies lasiocarpa/Alnus sinuate habitat. These moist sites occur primarily at the headwaters of drainages and at high to mid elevations in roadless and wilderness areas (Lyon et al. 1985). Moist areas in the project area are located away from roads and contain high elk security."

97.    The Beaver Creek EA does not disclose the Forest Plan standard that requires no more than 1.0 miles/square mile of open road density during the elk use period in areas with moist sites.

98.    The Beaver Creek EA does not provide a map of the areas with moist sites in the Project area.

99.    The Beaver Creek EA does not provide a calculation of linear open road density during the elk use period in the area with moist sites in the Project area.

100.    Project File Map M004 indicates that there are streams and wetlands/marshy

        areas throughout the Project area:



101.    Project File Map S004 shows the road density in these areas:



102.   In the Project area as a whole, excluding the wilderness area, open road density is 3.5 miles/square mile.  This fact is not disclosed to the public in the Project EA.

103.   In the Project area as a whole, including the wilderness area, open road density is 1.6 miles/square mile.  This fact is not disclosed to the public in the Project EA.

GLACIER LOON PROJECT

104.   In the Beaver Creek EA, the Forest Service states that "Present and Reasonably Foreseeable Actions are management activities or projects planned by the Forest Service, other government agencies, or private landowners in or near the analysis area, which could occur regardless of which alternative is selected for implementation. Present and Reasonably Foreseeable Actions are activities or projects that are ongoing or will be implemented within the next 10 years, including those that would recur annually." (Emphasis added).

105.   The Forest Service then states in "TABLE 17. PAST, ONGOING, AND REASONABLY FORESEEABLE ACTION ON NATIONAL FOREST SYSTEM LANDS" that "[t]here are no ongoing or reasonably foreseeable timber harvest activities occurring on NFS lands within the project area" and "[t]here is no ongoing or reasonably foreseeable road construction occurring

24

in the project area."

106.   The Glacier Loon Project is located on the Swan Lake Ranger District on the

Flathead National Forest in Missoula County, Montana.

107.   The Glacier Loon Project Area, which is 37,320 acres including 12,000 acres

of the Mission Mountain Wilderness, and extends south and west of Condon,

Montana on the west side of Montana Highway 83 to the south end of

Lindbergh Lake, is directly adjacent to the Beaver Creek Project area:




108.   Outside of the Wilderness Area, the Glacier Loon Project area has a total road density of 3.53 miles/square mile and an open road density of 1.6 miles/square mile.

109.   The Glacier Loon Project is located within the Buck Holland and Glacier Loon Bear Management sub-units, neither of which currently meet 19/19/68.

110.   The Glacier Loon Project area lies within six different Lynx Analysis Units: Buck; Elk; Glacier; Holland; Lower Beaver; and Upper Beaver.

111.   The Glacier Loon Project includes logging 1,405 acres of National Forest lands, 5.9 miles of new temporary road construction, the reopening and use of 16.0 miles of currently gated/bermed roads, and the use of 29.3 miles of currently open roads.

112.   During Glacier Loon Project implementation, total and open motorized route density will increase.

113.   The Glacier Loon Project will render unsuitable 1,282 acres of lynx habitat.

114.   The Glacier Loon Project will remove 1,042 acres of hiding cover.

115.   In the Beaver Creek EA, the Forest Service provides no mention or discussion of the cumulative effects of the directly adjacent and reasonably foreseeable Glacier Loon Project for the following resource sections:  Soils; Forest Vegetation; Invasive Plants; Fire & Fuels; Air Quality; Sensitive Species; Old Growth Species; Big Game Species; Snag Species; Migratory

Birds; Recreation, Wilderness, Lands, and Range; Scenery; Heritage Resource; Transportation; and Social and Economic Resource.

116.   In the Beaver Creek EA, the Forest Service provides no mention or discussion of the cumulative effects of the reasonably foreseeable Glacier Loon Project on lynx critical habitat.

117.   The discussion of lynx in the Beaver Creek EA states: "The Glacier Loon Project is a Forest Service fuels reduction and forest health project that is partially located within the Lower Beaver and Upper LAUs. The Glacier Loon Project would reduce lynx foraging stand initiation habitat by an additional 8 acres in the Lower Beaver LAU. The project also includes harvest treatments across an additional 213 acres of non-foraging habitat in Lower Beaver and would also treat 25 acres of non-foraging habitat in the Upper Beaver LAU. Lynx foraging habitat would remain well distributed through the project LAUs with consideration of the Glacier Loon cumulative effects."

118.   The discussion of lynx in the Beaver Creek EA does not address all impacts of the Glacier Loon Project on lynx.

119.   The discussion of grizzly bears in the Beaver Creek EA states: "The Glacier Loon project is a planned USFS forest health and fuels reduction project that would occur in the Glacier Loon and Buck Holland Subunits. The Glacier

Loon Project would reduce hiding cover in the Buck Holland Subunit by 157 acres. When considering both the Glacier Loon and Beaver Creek Project effects, the Buck Holland Subunit would still meet Forest Plan direction and cover would be distributed to allow secure grizzly bear travel throughout the subunit. The Glacier Loon Project is consistent with the SVGBCA, Amendment 19, and Forest Plan direction."

120.   The discussion of grizzly bears in the Beaver Creek EA does not disclose road density or road impacts of the Glacier Loon Project.

121.   The discussion of grizzly bears in the Beaver Creek EA does not address all impacts of the Glacier Loon Project on grizzly bears.

VII.  CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

The Forest Service's failure to analyze the Beaver Creek and Glacier Loon Projects in a single EIS, or otherwise fully address the cumulative effects of these projects, violates NEPA and the APA.

122.   All previous paragraphs are incorporated by reference.

123.   The CEQ regulations implementing NEPA require that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).

124. The CEQ regulations also require that two or more agency actions must be discussed in the same impact statement if they are "cumulative" actions, "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).

125. "Significance cannot be avoided by ... breaking [an action] down into small component parts." 40 C.F.R. § 1508.27(b)(7).

126. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

127. If there are "substantial questions that [timber sale projects] will result in significant environmental impacts," then "[a] single EIS, therefore [is] required to address the cumulative effects of these proposed sales." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998).

128. Additionally, if a timber sale EA does "not sufficiently identify or discuss the incremental impact that can be expected from each successive timber sale, or

how those individual impacts might combine or synergistically interact with each other to affect the ... environment. . . . [it does] not satisfy the requirements of the NEPA." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004).

129.   The Beaver Creek and Glacier Loon Projects are directly adjacent to each other in the same watershed, will be implemented during the same time frame, contain the same types of logging and burning, are both located within the Lower Beaver Lynx Analysis Unit, Upper Beaver Lynx Analysis Unit, and Buck Holland grizzly bear sub-unit, are located on the same Ranger District within the same National Forest, and serve the same purpose and need.

130.   Thus, the Beaver Creek and Glacier Loon "[p]roposals . . . are related to each other closely enough to be, in effect, a single course of action [that] shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).

131.   The Beaver Creek and Glacier Loon Projects are also cumulative actions because they will have cumulatively significant effects including but not limited to effects on elk, grizzly bears, lynx, and lynx critical habitat, including but not limited to significant degradation of habitat and wildlife displacement during project implementation, violation of Forest Plan standards, and adverse effects to listed species and critical habitat.

132.   These cumulatively significant impacts must be assessed in the same, single

EIS, 40 C.F.R. § 1508.25(a)(2), and the Forest Service cannot avoid this significance simply "by ... breaking [the action] down into small component parts." 40 C.F.R. § 1508.27(b)(7).

133.   Alternatively, the Beaver Creek Project NEPA analysis must contain a cumulative effects analysis that discloses the Glacier Loon Project as a reasonably foreseeable action for all resource areas and addresses all of the cumulative effects of the two projects for all resource areas.

134.   The Forest Service's failure to analyze the Beaver Creek and Glacier Loon Projects in a single EIS, or otherwise fully and adequately address Glacier Loon and its cumulative effects as reasonably foreseeable for all resource areas in the Beaver Creek EA, violates NEPA and the APA.

SECOND CLAIM FOR RELIEF

The Forest Service failed to demonstrate compliance with Forest Plan Amendment 19 and Management Situation 1 grizzly bear requirements in the Project EA in violation of NEPA, NFMA, and the APA.

135.   All previous paragraphs are incorporated by reference.

RECLAIMED ROADS:

136.   Forest Plan Appendix TT has an extensive section defining the term "reclaimed road" in Forest Plan Amendment 19:

***RECLAIMED ROAD***

31

**Definition:**
A reclaimed road has been treated in such a manner so as to no longer function as a road or trail and has a legal closure order until reclamation treatment is effective. This can be accomplished through one or a combination of treatments including: recontouring to original slope, placement of natural debris, or revegetation with shrubs or trees.

**Administrative Use**:
Administrative use of reclaimed roads may not occur.

**Closure Device:**
A legal closure order should be utilized until the reclamation treatment is effective. Naturally occurring local materials and native plant species should be utilized in the creation of barriers and revegetation of roadways. Minimum treatment requirements include:

    (a) The entire road will receive treatment such that maintenance or entries to maintain road drainage is not needed. This will require removal of culverts or other water passage structures that are aligned with stream channels. In most cases this will also require that road related sediment sources be repaired and the road reworked to eliminate ditch water flow without the aid of cross drain culverts.

    (b) The first portion of the road (typically 200 to 600 feet) will be treated in such a manner so as to preclude its use as a motorized or non-motorized travel way. This will include: (1) making the road junction area unattractive as a travelway, and (2) treating the remainder of the first portion to make awareness of the road improbable and preclude motorized or non-motorized use.

    (c) Treat the road, other than the first portion, in a way that will discourage its use as a motorized or non-motorized travelway. Treatment should include: sporadic placement of natural debris over most of the road length, and surface treatment to encourage natural, planted or seeded revegetation.

    (d) It is the intent in many cases that the reclaimed road no longer function as a road again. Recontouring should be considered where

resource protection and economics are favorable.

(e) The acceptable lag time for the treatment to become effective
and the expected persistence of people to continue to use a road
should dictate the amount and type of initial, and perhaps
follow-up, treatment required. Greater initial revegetation and
barrier work will be required if the expectation is to meet
reclaimed road criteria in one year as opposed to ten years, or if
heavy ORV pressure is expected on the barrier structures. These
factors should be described and considered in the design of
treatments for each site.

**Use of Reclaimed Roads in Calculations:**
Reclaimed roads that fully satisfy the definition of a reclaimed road
will not be included in calculations of open motorized access density,
total motorized access density, or security core area. Roads that have
been treated, but that do not yet fully satisfy the definition of a
reclaimed road will be included in calculations for total motorized
access route density. These roads will not be included in calculations
for open motorized access route density, or security core area if use is
low-intensity and non-motorized.

**Conversion of Reclaimed Roads to Trails:**
Roads scheduled for reclamation to meet total motorized access
density objectives may be converted to trails if necessary to maintain
access to the existing trail system. Other actions to convert a reclaimed
road to a trail must be made in consultation with the U.S. Fish and
Wildlife Service.

137.   The Forest Plan Appendix TT definition and requirements for reclaimed roads

were not fully disclosed to the public in the Project EA.

138.   The Project EA does not demonstrate that all Project roads that the Forest

Service plans to convert to "ISS" or "intermittent stored service" satisfy all

aspects of the Forest Plan Appendix TT definition and requirements for

reclaimed roads.

139.  First, as set forth in the table above, not all Project roads that the Forest
      Service plans to convert to "ISS" or "intermittent stored service" will be
      either fully recontoured, covered in natural debris, or planted with shrubs or
      trees as required by Forest Plan Appendix TT to meet the definition of
      "reclaimed roads."  The specific prescriptions set out for each road in Table
      A1-7 indicate that these roads will only have a barrier installed, such as an
      earthern berm (i.e. a pile of dirt), water bars on the road (to direct water
      flow), and/or culvert removal.

140.  Second, the Project EA fails to address the factors that the agency must
      consider when designing road reclamation specific to each road: "The
      acceptable lag time for the treatment to become effective and the expected
      persistence of people to continue to use a road should dictate the amount and
      type of initial, and perhaps follow-up, treatment required. Greater initial
      revegetation and barrier work will be required if the expectation is to meet
      reclaimed road criteria in one year as opposed to ten years, or if heavy ORV
      pressure is expected on the barrier structures. These factors should be
      described and considered in the design of treatments for each site."
      (Emphasis added).  These factors were not discussed in the Project EA.

141.  Third, the Project EA fails to address the requirements for reclaimed roads in

34

the time period between when they are closed and when reclamation is fully effective: "The first portion of the road (typically 200 to 600 feet) will be treated in such a manner so as to preclude its use as a motorized <u>or</u> non-motorized travel way. This will include: (1) making the road junction area unattractive as a travelway, and (2) treating the remainder of the first portion to <u>make awareness of the road improbable and preclude motorized or non-motorized use</u>." (Emphasis added).  These requirements were not discussed in the Project EA.  Certainly, a pile of dirt at the start of a road and placement of water bars will not "make awareness of the road improbable and preclude motorized or non-motorized use."

142.   Fourth, the Project EA fails to disclose and address the requirement that "Roads that have been treated, but that do not yet fully satisfy the definition of a reclaimed road <u>will be included in calculations for total motorized access route density</u>."   (Emphasis added).  This requirement is not disclosed in the EA, nor is there an estimate of when the reclamation will be effective.  The Project EA therefore provides misleading estimates of total motorized access route density because at least 8 miles of "intermittent stored service" roads will apparently be removed from total motorized access route density estimates immediately post-Project, even though the roads will still be passable at that time.

143. Additionally, the Forest Service's change in position in this case regarding its

interpretation of Amendment 19 was not fully disclosed and explained to the

public in the Project EA as required under the APA.  A prior email from a

Flathead National Forest biologist to Plaintiff Swan View Coalition

represented that "intermittent stored service" roads still count in total

motorized access route density estimates:

> From: Keith Hammer [mailto:keith@swanview.org]
> Sent: Thursday, May 28, 2015 10:59 AM
> To: Ruby, Mark D -FS
> Subject: Chill James
>
> Mark;
>
> I'm reading the Chilly James EA and have read the portions
> relative to grizzly bear and Amendment 19 standards.
> While it makes clear that road decommissioning reduces road
> densities and increases security core, I cannot find where it
> details whether road "storage" such as ISS reduces road
> densities and/or increases security core.
>
> Can you point me to where in the EA this is detailed and, if not
> in the EA, please answer the question of whether road storage
> does so in an email reply?
>
> Thanks,
>
> Keith
>
> Hi Keith,
>
> The draft EA states that stored roads in the Chilly James project
> would continue to count towards total motorized route density
> (EA Chapter 3 pg. 183 under "Amendment 19 and the Chilly

James Project") and not affect the percentages for security core. Unfortunately, there is an error in the Road management/ Transportation section that **incorrectly states ISS roads are no longer counted in total route density** or security core calculations.

Thanks,
Mark Ruby
Wildlife Biologist
Forest Service
Swan Lake Ranger District

(Emphasis added).  Thus, the agency position in this case that "ISS roads" do not count in total route density is a change in position that has not been acknowledged or fully explained in the Project EA.

144.  Finally, Plaintiffs provided evidence in the record to demonstrate that even if a road is impassable as the "existing condition," if it is then cleared for agency use, it is no longer reclaimed because it no longer precludes motorized and non-motorized access.  The photograph on the left is a revegetated road. The photograph on the right is the same road in a location that was cleared for fire-fighting.  It is reasonable to assume that roads in the Beaver Creek area that are revegetated as "existing condition" will appear similar in nature to the photograph on the right after they are cleared and used for log-hauling in the Project area.  Such roads will take years before they have revegetated to an extent that again precludes motorized and non-motorized use as required by

Forest Plan Appendix TT.

 

145.  Furthermore, Plaintiffs provided evidence in the record to demonstrate that

merely placing a pile of dirt (i.e. a "berm") in front of the road will not

preclude motorized and non-motorized use as required by Forest Plan

Appendix TT.  The photograph on the left shows that a berm and boulders

were placed in front of Road 1678, but it is still obvious to the public that

there is a road behind the berm.  Morover, the photograph to the right shows

that ATV users can simply drive around the berm: there are tire tracks in mud

beyond the berm that document that ATV users did in fact drive around the

berm in front of Road 1678 and continue to drive down the road.  Thus, a

"berm" is not a sufficient barrier to preclude motorized and non-motorized use and therefore is not sufficient to reclaim a road as required by Forest Plan Appendix TT.




## MANAGEMENT SITUATION 1:

146.    The Project falls within "Management Situation 1" grizzly bear habitat.

147.    The Interagency Grizzly Bear Guidelines, which are incorporated into the Forest Plan, require that in Management Situation 1 habitats, the Forest Service's "[m]anagement decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete."

148.    In addition, the Guidelines state that "[l]and uses which can affect grizzlies and/or their habitat will be made compatible with grizzly needs or such uses

will be disallowed or eliminated."

149.   The Project does not comply with the Guidelines because the Project decision favors logging and roads over grizzly bear needs, and the Project is not compatible with the needs of grizzly bears as required.

150.   First, the Project will increase open motorized access route density over one mile/square mile to 30% of the Buck Holland sub-unit and 31% of the Beaver Creek subunit during Project implementation, despite the fact that the goal of Swan Valley Grizzly Bear Conservation Agreement sets a 21% limit as its goal.  The 21% goal was not disclosed to the public in the Project EA.

151.    Second, FWS finds that the increase in open and total motorized route density and decrease in security core during the Project is likely to adversely affect grizzly bears.

152.   Third, the Project will displace bears for up to five years.

153.   Fourth, the Project includes "commercial use," i.e. "road construction, road reconstruction, and timber harvest," in the time period that is supposed to be "inactive" for commercial use in the Project area in the Beaver Creek sub-unit.

154.   Fifth, the Project includes helicopter ignition of prescribed burns in occupied core grizzly habitat.

155.   Sixth, the Project does not bring the affected grizzly bear subunits into

compliance with the 19/19/68 requirement of Forest Plan Amendment 19.

156.   Seventh, the Project subtracts "intermittent stored service," i.e. Maintenance
       Level 1, roads from total motorized route density calculations even though
       they will not immediately qualify as "reclaimed roads" pursuant to the
       definition in Forest Plan Appendix TT and therefore may not be subtracted
       from such calculations.

157.   Cumulatively, all of these facts indicate that the Project favors logging and
       roads over the needs of grizzly bears and is not compatible with the needs of
       grizzly bears as required for Management Situation 1 areas.

158.   The Forest Service's failure in the Project EA to demonstrate compliance
       with its Forest Plan requirements for reclaimed roads and Management
       Situation 1 areas violates NFMA and NEPA and the APA.

THIRD CLAIM FOR RELIEF

The Forest Service failed to demonstrate compliance with the Forest Plan elk open
road density standard in the Project EA in violation of NEPA, NFMA, and the APA.

159.   All previous paragraphs are incorporated by reference.

160.   Under a section entitled "Security Areas," the Forest Plan contains a standard
       that prohibits open road density over 1.0 miles/square mile "during the elk
       use period" in "Areas with 'moist sites.'"

161.   The Montana Elk-Logging Study (Forest Plan Appendix DD) clarifies that the

protection should be applied "during" timber harvest.

162.   The Montana Elk -Logging Study clarifies that moist sites "are often found at the heads of drainages, bordering streams or marshy meadows, or occupying moist swales or benches."

163.   The Project EA does not acknowledge or disclose this Forest Plan standard to the public, but instead represents that no such standard exists:  "The Forest Plan does not have any standards for elk security."

164.   The Project EA does not provide a map of the locations of "areas with moist sites" in the Project area.

165.   The Project EA does not disclose open road density in "areas with moist sites."

166.   There are areas with moist sites bordering streams or marshy meadows throughout the Project area.

167.   In the Project area as a whole, excluding the wilderness area, open road density is 3.5 miles/square mile.  This fact is not disclosed to the public in the Project EA.

168.   In the Project area as a whole, including the wilderness area, open road density is 1.6 miles/square mile.  This fact is not disclosed to the public in the Project EA.

169.   "Under NFMA, the Forest Service calculations need not be perfect.  [].

However, we must still be able reasonably to ascertain from the record that the Forest Service is in compliance with the [Forest] Plan standard." *Native Ecosystems Council v. USFS*, 418 F.3d 953, 963 (9th Cir. 2005).

170.   The Forest Service's failure in the Project EA to acknowledge and provide enough detailed information to demonstrate compliance with its Forest Plan standard that prohibits open road density over 1.0 mile/square mile during the elk use period in areas with moist sites violates NFMA and NEPA.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.   Declare that implementation of the Project violates the law;

B.   Enjoin implementation of the Project;

C.   Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under EAJA; and

D.   Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 31st Day of August, 2017.

/s/ Rebecca K. Smith
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
Attorneys for Plaintiffs