
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN, SWAN VIEW COALITION, ALLIANCE FOR THE WILD ROCKIES, and NATIVE ECOSYSTEMS COUNCIL, | CV 17–120–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| RICH KEHR, U.S. Forest Service Swan Lake District Ranger, CHIP WEBER, U.S. Forest Service Flathead National Forest Supervisor, LEANNE MARTEN, U.S. Forest Service Region One Forester, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants. | |

Before the Court are the parties' cross-motions for summary judgment. For the reasons explained, the Court grants Defendants' Motion (Doc. 12) and denies Plaintiff's Motion (Doc. 8).

**INTRODUCTION**

Plaintiffs Friends of the Wild Swan, Swan View Coalition, Alliance for the

-1-

Wild Rockies, and Native Ecosystems Council ("Friends") are environmental

organizations that challenge the United States Forest Service's ("Forest Service")

authorization of the Beaver Creek Landscape Restoration Project ("Project" or

"Beaver Creek Project"). Friends urge the Court to remand the Project to be

evaluated in a single Environmental Impact Statement ("EIS") along with the

Glacier Loon Fuels Reduction and Forest Health Project ("Glacier Loon Project").

The two projects are adjacent, occupy facing shorelines of Lindberg Lake, and

each propose logging activities in the Buck Holland grizzly bear subunit. As

Friends accurately state, the two projects "fit together like puzzle pieces." (Doc.

9 at 10.) Alternatively, Friends argues that the Court should remand the Beaver

Creek Project's Environmental Assessment ("EA") to conduct a more thorough

analysis of the cumulative impacts resulting from the two projects, and recalculate

road density standards in grizzly bear and elk security habits to determine

compliance with the Flathead National Forest Plan ("the Forest Plan"). Lastly,

Friends asks the Court to order a new Biological Opinion to assess the impact of

the Legacy Lands acquisition[1] on grizzly bear populations in the area. The Court

---

[1] "In 2009, the Forest Service acquired title to approximately 111,740 acres of private land previously owned by The Nature Conservancy, known as Legacy Lands." *Swan View Coalition v. Weber*, 52 F. Supp. 1133, 1138 (D. Mont. 2014) (internal quotation marks omitted). This acquisition resulted in the Forest Service obtaining title to seven new grizzly bear subunits in the area. AR 10347. Amendment 19 of the Forest Plan provides stringent numerical objectives limiting road density in grizzly bear habitat on lands which are predominantly (greater than 75 percent) national forest. *Id.* at 1147–48. The Court's decision in *Swan View Coalition*

-2-

will address these claims below.

## BACKGROUND

The Beaver Creek Project is located on the Flathead National Forest
approximately nine miles south of Condon. AR 60326. It encompasses 34,962
acres of forest, 20,026 acres of wilderness, and a small portion of private land.
*Id.* The project implements a variety of management directives at the national,
regional and local level, with the purpose of restoring natural forest habitat and
reducing fuel accumulations which pose a threat of uncharacteristic wildfire.[2] *Id.*
The Project proposes to undertake these objectives by implementing silvicultural
treatments, thinning, logging, prescribed burning, and various other treatments.
AR 60336–37. To access the areas targeted for treatment, the Project proposes
building 7.5 miles of temporary roads, while decommissioning 4.5 miles and
placing an additional 12.58 miles of road into intermittent stored service ("ISS
roads"). AR 60337.

The Beaver Creek Project area is adjacent to the Glacier Loon Project area.
The Glacier Loon Project is also a forest restoration and fuel management project,
which utilizes similar forest treatments and temporary road construction. *See*

determined that Amendment 19's road density objectives applied to the project areas. *Id.* at
1148–49.
    [2] "Uncharacteristic wildfire is extreme fire behavior resulting from the product of
effective fire suppression during the last century." AR 60335.

*generally Swan View Coalition v. Weber*, 52 F. Supp. 1133 (D. Mont. 2014)

(reviewing the Glacier Loon Project EA and remanding for further analysis).    The

Forest Service approved the project in February 2013.    *Id.* at 1139.    In July 2014,

plaintiffs—the same plaintiffs in this suit—challenged the Forest Service's EA and

finding of No Significant Impact.    *Id.*    This Court partially granted judgment in

favor of the plaintiffs, and clarified that the numerical access objectives provided

in Amendment 19 apply to the lands acquired from The Nature Conservancy.    *Id.*

at 1140.    Since that time, the Forest Services has amended its EA and the Glacier

Loon Project is in the public comment phase.

In December 2016, the Forest Service published the Beaver Creek Project

EA.    The EA documents the impact that the Project will have on several species

which either reside, or have designated critical habitat, within the Project area,

including grizzly bears, Canada lynx, and water howellia.    Ultimately, the Forest

Service concluded that the Project did not require an EIS upon finding No

Significant Impact.    Friends challenges that finding and raises claims under the

National Environmental Policy Act ("NEPA"), the National Forest Management

Act ("NFMA"), and the Administrative Procedures Act ("APA").[3]

---

[3] Friends also alleges claims under the Environmental Species Act, 16 U.S.C. § 1540(g). However, Friends does not address the factual or legal basis for any such claim in its briefing. For this reason, the Court will limit the scope of Friends' claims to those that arise under NEPA, NFMA, and APA.

-4-

## LEGAL STANDARDS

### I.     National Environmental Policy Act

NEPA "has twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action.    Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."    *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotations and citations omitted).    "NEPA is a procedural statute that does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."    *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal citations and quotation marks omitted); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (stating that NEPA "prohibits uninformed–rather than unwise–agency action").

Before undertaking any "major Federal action significantly affecting the quality of the human environment," an agency must prepare a detailed EIS.    42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.    In order to decide whether an EIS is necessary, an agency may prepare an EA.    40 C.F.R. § 1508.9.    An EA is a "concise public document" that must "briefly provide sufficient evidence and

analysis for determining whether to prepare an environmental impact statement."

*Id.* "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b). If the EA concludes that the proposed action will not have a significant effect on the environment, the agency may issue a Finding of No Significant Impact and may then proceed with the action. 40 C.F.R. § 1508.13.

Courts apply a "rule of reason" in reviewing the adequacy of an EA. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004). This requires the court to make a "pragmatic judgment" as to whether an EA adequately discusses the environmental consequences of a project and fosters informed public participation. *California v. Block*, 690 F.2d 753 (9th Cir. 1982). While courts must "strictly interpret the procedural requirements in NEPA and . . . [its] regulations," *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001), courts must "be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency," *Klamath-Siskiyou Wildlands Center*, 387 F.3d at 993 (internal citations omitted). "[T]he ultimate standard of review is a narrow one," and a court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

## II.     National Forest Management Act

NFMA requires forest planning of National Forests at two levels: the forest level and the individual project level.    16 U.S.C. §§ 1600–1687.    At the Forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System."    16 U.S.C. § 1604(a).    A Forest Plan sets broad guidelines for forest management and serves as a programmatic statement of intent to guide future site-specific decisions within a forest unit.    *Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 966 (9th Cir. 2003); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998).    Forest Plans must "provide for multiple use and sustained yield of the products and services" derived from the National Forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1).    At the individual project level, NFMA requires that each individual project be consistent with the governing Forest Plan.    *Great Old Broads for Wilderness v. Kimbrell*, 709 F.3d 836, 851 (9th Cir. 2013).

The Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference.    *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003).    This deference may be set aside only where an agency takes a position that is "contrary to the clear language" of the Forest Plan.    *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir.

2005).

## III. The Administrative Procedure Act

Under the APA, a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedures required by law." 5 U.S.C. § 706(2). As recently articulated by the Ninth Circuit:

> Under this standard of review, an agency must examine the relevant data and articulate a satisfactory explanation for its action. An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.

*Organized Village of Kake v. U.S. Dep't of Agriculture*, 746 F.3d 970, 974 (9th Cir. 2014) (internal citation and quotation marks omitted).

Though a review of agency action under APA must be "thorough, probing, [and] in-depth," *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415, the standard of review is "highly deferential," *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). The court must presume the agency action is valid and affirm it if a reasonable basis exists for the decision. *Id.*

**IV.   Summary Judgment**

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if it "can show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Generally, cases involving review of final agency action under APA do not involve fact finding but only a review of the administrative record. *Northwest Motorcycles Ass'n v. U.S. Dep't of Agriculture*, 18 F.3d 1468, 1472 (9th Cir. 1994).   Accordingly, summary judgment is the appropriate process to resolve this case.

## DISCUSSION

**I.   NEPA Claims**

Friends' argument under NEPA is twofold: first, it claims that the Forest Service violated NEPA by failing to analyze the Beaver Creek and Glacier Loon Projects in a single EIS.   Additionally—or alternatively—Friends challenges the sufficiency of the Beaver Creek EA's cumulative effects analysis itself.

### A. Necessity of a Single EIS

"A single NEPA review document is required for distinct projects when there is a single proposal governing the projects, or when the projects are 'connected,' 'cumulative,' or 'similar' actions under the regulations implementing

NEPA." 40 C.F.R. § 1508.25;[4] *Native Ecosystems Council v. Dombeck*, 304
F.3d 886, 893–94 (9th Cir. 2002). The only question here is whether the two
Projects are "cumulative actions." The purpose of this inquiry is to "prevent an
agency from dividing a project into multiple actions, each of which individually
has no insignificant environmental impact, but which collectively have a
substantial impact." *Native Ecosystems Council*, 304 F.3d at 894. Friends bears
the burden to show that the Forest Service was arbitrary and capricious in failing to
prepare one comprehensive environmental statement. *Id.*

Friends argues that the circumstances here are analogous to *Blue Mountains
Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998). There, the
Forest Service circumvented an EIS and failed to discuss the cumulative impacts of
five separate timber sales which were proposed simultaneously, would occur
simultaneously, were located within the same watershed, and were designed to
address the aftermath of a series of fires that devastated the forest surrounding the
North Fork of the wild and scenic John Day River. *Id.* at 1210. The Ninth
Circuit concluded that the project was, in essence, a single salvage timber sale
action, and that the agency's piecemeal analysis in separate EAs—many of which

---

[4] While the plain language of 40 C.F.R. § 15.0825 describes only the scope of an EIS, the
Ninth Circuit has extended the principle to EAs as well. *Kern v. U.S. Bureau of Land Mgmt.*,
284 F.3d 1062, 1076–77 (9th Cir 2002).

-10-

did not even recognize the existence of the adjacent sales—at least raised
substantial questions that that the proposed sale would result in significant
environmental impacts. *Id.* at 1216.

The Forest Service argues that the Beaver Creek and Glacier Loon Projects
are two independent projects, with independent schedules, proposed at different
times, and therefore *Earth Island Institute v. U.S. Forest Service*, 351 F.3d 1291
(9th Cir. 2003), rather than *Blue Mountains*, is the appropriate yardstick to guide
this issue. In *Earth Island*, the Ninth Circuit concluded that the Forest Service
did not violate NEPA by providing two separate EISs for two salvage projects,
each on a separate national forest. *Id.* at 1295–96. Even though each range was
governed by the same forest plan which provided the same restrictions on logging
within spotted owl habitat, the court determined that the facts of the case did not
align squarely with *Blue Mountains. Id.* at 1305. Moreover, the court found that
"nothing in the record suggest[ed] that the agency intended to segment review to
minimize cumulative impact analysis." *Id.* Rather, the Forest Service's
recognition and analysis of the adjacent project in its respective EIS was pivotal to
the court's determination that the agency had not attempted to evade the
requirements of NEPA by providing separate documents. *See id.*

Here, as in *Earth Island*, there is no indication that the Glacier Loon and
Beaver Creek Projects were segmented to avoid comprehensive review or to

-11-

minimize their combined environmental impact. The Glacier Loon Project was proposed in 2013 and approved to begin in 2014. The Beaver Creek Project was proposed in 2014 and was intended to begin in 2017. Though the projects share geographic features, overlap in grizzly bear and lynx critical habitats, and propose many of the same forest treatments, this does not inherently render them "cumulative actions." In all likelihood the two projects will proceed on different timelines. In short, these are not the sort of coordinated proposals described in *Blue Mountains.* More importantly, there is simply no evidence that the Forest Service intended to avoid a more comprehensive analysis of the two Projects by severing them into two EAs in an attempt to deceive the public or minimize the extent of their combined impacts. In fact, the EA explains that one of the changes made prior to the final draft of the EA was to "clarify the cumulative effects analysis for grizzly bears, lynx, lynx critical habitat, and water howellia and their consideration of the Glacier Loon and Cold Jim projects." AR 60324. Having found the constellation of factors present in *Blue Mountains* absent from this case, the Court concludes the Forest Service was not arbitrary or capricious in its decision to conduct separate EAs.

### B. Adequacy of the Cumulative Effects Analysis

Next, Friends challenges the sufficiency of the Beaver Creek Project's cumulative impacts analysis as it pertains to the Glacier Loon Project. Friends

-12-

notes two deficiencies: first, the Beaver Creek EA fails to mention any combined impact from the Glacier Loon Project on numerous resources.[5] Friends further argues that to the extent the Beaver Creek EA considered the cumulative impact from the Glacier Loon Project on lynx critical habitat, its cursory analysis does not constitute a "hard look" as required by NEPA.

The Forest service argues that it is within the agency's discretion to tailor the scope of its analysis to those impacts which are relevant. The Forest Service claims that the EA examined the cumulative impacts where it determined that the Projects intersected—that is on grizzly bear, lynx, and aquatics habitats.

In assessing the significance of a particular agency action, NEPA requires an agency to consider the cumulative impacts of a project. 40 C.F.R. § 1508.27(7). NEPA defines a cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions .... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* "Consideration of cumulative impacts requires some quantified or detailed information that results in a useful analysis, even when the agency is

---

[5] Specifically, Friends argues that the EA does not discuss the impacts of the Glacier Loon Project on soils, forest vegetation, invasive plants, fire and fuels, air quality, sensitive species, old growth species, big game species, snag species, migratory birds, recreation, wilderness, lands, and range, scenery, heritage resource, transportation, and social and economic resources. (Doc. 9 at 14.)

-13-

preparing an EA and not an EIS." *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (internal quotation and citation omitted). "General statements about 'possible effects' and 'some risk' do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* "Superficial analysis, vague generalities, and conclusory discussions without some "quantified or detailed information" are similarly insufficient. *Id.* at 1008; *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993–94.

A cumulative impacts analysis does need to be discussed in the "cumulative impacts statement" but can be found by looking at the document as a whole. *E.g. Ecology Center v. Castaneda*, 574 F.3d 652, 667 (9th Cir. 2009); *Western Watersheds Project v. Salazar*, 993 F. Supp. 2d 1126, 1141 (C.D. Cal. 2012). Courts should defer to the agency's determination on what evidence to include and how to present it. *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008).

The Court does not agree with Friends' first contention that the EA violates NEPA because it does not address the cumulative impacts from the Glacier Loon Project for each resource otherwise discussed. Whether a given resource will be effected by activities in its surrounding is a scientific determination within the agency's expertise. The EA explains that the analysis area "identified and

-14-

described for each natural resource area ... may vary from resource to resource."

AR 60406–07. For many resources, the agency concluded that there was no need

to look beyond the geographic bounds of the Project area in analyzing the direct,

indirect, or cumulative effects.[6] For example, the analysis area analyzed for soils

looked only at the "proposed treatment units and temporary roads for the Beaver

Creek Project." AR 60414. The EA explains that this "analysis area was

selected because it is where the effects of implementing the proposed activities

would occur. The effects on soils would not extend beyond the units proposed for

treatment." *Id.* This is the sort of scientific determination where the Court must

defer to the agency's expertise. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at

993.

For other resources, the analysis area was broader and therefore

contemplated the impacts in the surrounding ecosystem.[7] Additionally, the

Glacier Loon Project was specifically discussed in at least four places: grizzly bear

---

[6] This was the case for soils (AR 60414), forest vegetation (AR 60436), fire and fuels (AR 60535), old growth species (AR 60729), big game species (AR 60751), snag species (AR 60772), migratory birds (AR 60778).

[7] This was the case for invasive plants where the analysis area included "the boundary of the project area, the broadcast burn units, and those haul routes that lead into the project area" (AR 60503); the analysis for threatened or endangered species included the Lower and Upper Beaver Lynx Analysis Units (AR 60632, 60656), and the Beaver Creek and Buck Holland Grizzly Bear subunits (AR 60664); water howellia, a threatened plant species, was analyzed across the "entire meta-population for water howellia in the Swan Valley" (AR 60511); the analysis area for air quality was Airshed 2 which includes "Flathead, Lake, Sanders, and the northern portions of Missoula and Powell Counties" (AR 60561).

habitat, lynx habitat, aquatics habitat, and threatened plant species. AR 60674, 60661, 60647, 60626, 60619, 60519. These are the places where the agency determined that there was an intersection between the Beaver Creek and Glacier Loon Projects. The EA also explains that cumulative impacts will not be discussed for every resource. For example, a direct or indirect effect is a necessary predicate for a cumulative impact, and the EA explains that absent the former it will not discuss the latter. AR 60408.

Having reviewed the cumulative effects analysis for each resource listed, the Court determines that where the agency did not expressly consider the combined impacts from the Glacier Loon Project, it provided a clear statement as to why it limited the scope of its analysis to the Project area. The record as a whole indicates that the agency took a "hard look" at where the Projects overlapped and tailored its analysis appropriately. This satisfies NEPA.

Friends next claims that the cumulative impacts analysis concerning the Canada lynx is vague and perfunctory, and is precisely the sort of analysis that the Ninth Circuit deemed insufficient in *Klamath-Siskiyou*. There, the Bureau of Land Management conducted separate EAs for two timber sale projects within the same watershed. *Id.* at 991. Although each purported to examine the cumulative impact on the watershed from the total logging conducted by each project, the Ninth Circuit determined that the analysis failed to provide any

-16-

quantified or detailed assessment of the impacts. *Id.* at 994–46. The Court

noted that despite the EA's 12-page section entitled "cumulative effects," the

content within the section, including its charts, tables, and narrative descriptions,

provided no indication as to how or why it concluded that "a particular

environmental factor would be 'unchanged,' 'improved,' or 'degraded.'" *Id.* at

994. Additionally, the Court stated that "while the total number of acres to be

harvested in the watershed is a necessary component of a cumulative effects

analysis, . . . it is not a sufficient description of the actual environmental effects."

*Id.* at 995. The Court wanted both: a quantifiable tally of the resources effected

and an explanatory justification for the agency's conclusion. *See id.* at 994–95.

Friends argues that the cumulative impacts section in the Beaver Creek EA

is even more egregious than the shortcomings of the Indian Soda EA that the Court

found insufficient in *Klamath-Siskiyou.* According to Friends, the Beaver Creek

EA indicates only that "timber management and road building" from past, ongoing,

and future timber management projects "have an effect on the availability of forage

and denning habitat for Canada lynx," AR 60661, without determining the degree

or reason for the effect. Friends further notes that the Beaver Creek EA fails to

calculate the proposed total acres logged and land effected.

First, the Court recognizes the deference it owes to the agency's decision

regarding how and where to present its evidence, and will not elevate form over

-17-

substance.  *See California*, 690 F.2d at 761; *League of Wilderness Defenders-Blue Mountains Biodiversity Project*, 549 F.3d at 1218.  Though the cumulative effects section as it pertains to lynx critical habitat is lean—it takes up no more than a page and a half—the discussion is considerably more in depth when read in its fuller context.  For starters, the discussion of the Project's impact upon lynx is listed under two headings: Canada Lynx (AR 60632–53) and Canada Lynx Critical Habitat (AR 60655–63).  The Glacier Loon and other timber projects in the area are discussed in both sections.  Both sections explain the importance of contiguous land for lynx—both in terms of the lynx's ability to move securely through the land, and the importance of undisturbed quality snowshoe hare habitat. AR 60646, 60661–62.  The EA also explains that the largest threat to lynx habitat is "major highways and permanent developments."  AR 60647.

Both the Beaver Creek and Glacier Loon Projects encompass the Lower and Upper Beaver LAU.  *Id.*  While the Beaver Creek Project does not propose any highway improvement or development of lands within the Lower Beaver LAU, the EA speculates that future highway improvement or development on private land within the Lower Beaver LAU may occur and is discussed in the habitat baseline. *Id.*  However, the EA goes on to explain that the Legacy Land acquisition will "minimize the negative effects of human and related activities from the development of private lands, and insure (sic) that a larger portion of lynx habitat

in the Swan Valley will be managed" under the forest guidelines.    AR 60647.

What this narrative explanation makes clear is that the acquisition of the Legacy Lands is essential to maintaining large acreage of contiguous forest lands in the surrounding area.    AR 60662.    Given this, the EA describes that even with the added acreage impacted by the Glacier Loon Project or possible future development in the Lower Beaver LAU, "lynx foraging habitat will remain well distributed through the project LAUs."    AR 60647.    This description goes beyond *Klamath-Siskiyou* because it explains to the reader *why* the impact will not be significant: because neither project proposes large scale or permanent development, and because the forest service has acquired and now controls vast acreage in the surrounding area, lynx critical habitat will remain sufficiently contiguous to ensure a healthy hare population and ensure lynx's secure travel. This explanation was precisely what was missing from the discussion in *Klamath-Siskiyou.*    Though the Court has taken a generous reading of the text in its analysis, this is what APA requires.

Friends further argues that this analysis is insufficient because it doesn't indicate the total acreage impacted by the two Projects, which *Klamath-Siskiyou* indicated was a minimum requirement.    Friends is correct that the total acreage is not revealed in the narrative discussion.    However, when read with the accompanying graphs, the total impacted acreage is clear.    As a starting point,

-19-

Table 67 "displays the approximate acre changes in available foraging habitat by LAU" for the Beaver Creek Project's Alternative 2 proposal. AR 60638. The table indicates that the Lower Beaver LAU has 1,902 acres of pre-project stand imitation, while the Upper Beaver LAU has 740 acres. Alternative 2 for the Beaver Creek Project would reduce the stand imitation acreage in the Lower Beaver LAU to 1,541 (resulting in a net decrease of 361 acres) while proposing no changes to the Upper Beaver LAU. *See* AR 60638. The narrative description that discusses the impact of the Glacier Loon Project indicates that it would further reduce the stand imitation in Lower Beaver by an additional 8 acres. From this it can be easily calculated that the combined impacts of the Beaver Creek and Glacier Loon Projects under Alternative 2 will result in a net decrease of 353 acres of stand imitation in the Lower Beaver LAU. A similar analysis can be done under Alternative 3.[8] While the Court concedes that the EA does the bare minimum, for

---

[8] Having surveyed the record, the Court is unable to find a statement disclosing the entire extent of the acres impacted by the Glacier Loon Project. The EA only discloses the acreage effected within the Lower and Upper Beaver LAU. On one hand, this would seem to be the sort of minimum disclosure that *Klamath-Siskiyou* indicates is a necessary but not sufficient requirement for a thoughtful cumulative effects analysis. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 995. On the other hand, the EA does an adequate job of disclosing the effected acreage within the Lower and Upper Beaver LAU which extends the analysis area beyond that of the Project boundary. The Ninth Circuit has provided some guidance on this issue in *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754 (9th Cir. 1996), where it held that the Forest Service did not have to extend its analysis of cumulative effects beyond the project boundaries in order to adequately assess the effects of adjacent projects within an entire population ecosystem. *Id.* at 764. The court stated that "NEPA does not require the government to do the impractical," and noted that such a requirement would "require a level of analysis sufficient to stop all action in the Forest while every conceivable effect is catalogued."

the reasons already explained, it is enough.

Accordingly, the Court concludes that the Beaver Creek EA has complied with NEPA on these accounts.

## II.    Roads

Friends raises two objections to the EA's proposed road treatment plan. The first concerns grizzly bears and the second concerns elk.

### A. Road Density Calculation in Grizzly Bear Subunits

Friends argues that the Beaver Creek Project violates NFMA because it does not comply with the road density objectives in grizzly habitat as provided in Amendment 19 of the Flathead National Forest Plan.

NFMA requires that each National Forest develop a "Land and Resource Management Plan" often referred to as a forest plan. 16 U.S.C. § 1604(a). Each project within a national forest must be consistent within the governing forest plan. 16 U.S.C. § 1604(i). The failure to comply with a forest plan constitutes a NFMA violation. *Native Ecosystem Council v. U.S. Forest Serv.*, 418 F.3d at 961. Forest Plan Amendment 19 protects grizzly bear habitat by providing certain

---

*Id.* (internal citations and quotation marks omitted). Because the EA adequately discloses the total acreage of foraging stand imitation and non-foraging habitat reduced from the Glacier Loon Project within the Lower and Upper Beaver LAU, which extends the analysis area beyond that of the project boundary, the Court concludes that the agency was not arbitrary and capricious by failing to disclose the entire extent of lynx habitat impacted from the Glacier Loon project.

standards and objectives for road density within the grizzly bear subunits. The

Forest-wide standards provide that "Forest Service activities will not result in an

increase in motorized access density or a reduction in core areas." AR 52325–26.

Additionally, on lands which are predominantly owned by the forest service

(greater than 75 percent), the Forest Plan provides for short and long-term

objectives to help reduce overall road density in grizzly bear critical habitat in

order to achieve ratios that are conducive to stabilizing the grizzly population. AR

52648. The five-year objectives provide that: (1) "open motorized access is less

than 19%"; (2) "total motorized access . . . will be brought to 24% density"; (3)

"security core area will provide at least 60%." AR 52325. The ten-year

objectives provide that "total motorize access is less than 19%" and "security core

areas are 68 to 100 percent." *Id.* The ten-year objectives are often referred to as

the 19/19/68 objectives.

Friends argues that the Beaver Creek Project violates NEPA and NFMA

because the EA states that the Project is in compliance with Amendment 19.

According to Friends, this statement is untrue for two reasons. First, Friends

observes that post-project road densities in the Buck Holland subunit will be far

greater than those permitted under the 19/19/68 ten-year objective, rendering the

Project inconsistent with Amendment 19. Next, Friends argues that each of the

EA's calculations assumes that ISS roads may be subtracted from the road density

determination.    Amendment 19 is clear that only "reclaimed roads" may be subtracted from road density calculations and Friends argues that the proposed treatment plan for the ISS roads will not meet "reclaimed" status.    Therefore, according to Friends, the EA falsely concludes that the Project complies with Amendment 19.    The Court will address these arguments in that order.

### i.    Buck Holland's Compliance with Amendment 19

Friends argues that the Forest Service violated NEPA and NFMA because it approved the Project in the Buck Holland subunit knowing that it would never comply with the 19/19/68 objectives of Amendment 19.    The EA states at the completion of the project, the road density levels in the Buck Holland subunit will be 24/37/40.    AR 1709.

The Forest Service claims that there is an important distinction between the standards and objectives.    According to the Forest Service, the only mandatory requirement is that a project result in "no net increase in open motorized road density and no net decrease in the size or amount of security core."    Further, the Forest Service argues that the ten-year objectives have not yet been triggered and will not be triggered until December 31, 2018.    For these reasons, the Forest Service believes that the Project in the Buck Holland subunit complies with Amendment 19.

Amendment 19 itself does not clearly indicate how the standards and

-23-

objectives are different from one another and whether the objectives are mandatory. This is important to determine because the Project proposed in the Buck Holland subunit will not comply with either the five or ten-year objectives at its conclusion. However, the Notice of Decision giving rise to Amendment 19 provides better instruction. It clearly distinguishes between standards and objectives. *See* AR 52643. Listed under the heading "Forest-wide Standards for Grizzly Bear" the section instructs that no Forest Service actions will result in a net increase in total or open motorized density, nor will it decrease security core. AR 52643. It also states that all "Forest Service actions will result in a net gain towards the objectives on National Forest System lands." *Id.* Under the heading "Forest-wide Objective for Grizzly Bear," the section sets forth the five and ten-year objectives as already described. *See* AR 52643. What this document makes clear is that the minimum requirement for any Forest Service action is that it move the area closer to compliance with the Forest objectives.

Here, the Project does not clearly violate the dictates of Amendment 19. Within the Buck Holland subunit, pre-project road density is calculated at 24/41/40. AR 1709. Post-project density is calculated at 24/37/40. *Id.* This result does not increase open road density, it decreases total road density, and security core remains the same. *Id.* In the Beaver Creek subunit, pre-project road density is calculated at 6/26/66. *Id.* Post-project density is calculated at

-24-

6/19/68. *Id.* This meets the ten-year objectives for total road density and security core, and is well below the proscribed ratio for open motorized density. *See id.* This result clearly satisfies the requirement that every Forest Service action "must result in a net gain towards the objective on National Forest system lands." AR 52643. For this reason, the agency was not arbitrary or capricious in concluding that the Project complied with Amendment 19, assuming the agency calculated road density standards correctly.

### ii. Exclusion of ISS Roads from Density Calculations

The Forest Plan is clear that only "reclaimed roads" may be excluded from road density calculations. AR 56217–19. Appendix D to Forest Plan Amendment 19 provides a detailed and specific definition of what constitutes a "reclaimed road":

> A reclaimed road has been treated in such a manner so as to no longer function as a road or trail and has a legal closure order until reclamation treatment is effective. This can be accomplished through one or a combination of treatments including: recontouring to original slope, placement of natural debris, or revegetation with shrubs or trees.

AR 56218.

The definition goes on to explain the minimum treatments required to achieve "reclaimed" status.[9] *See id.* Subsection (d) of the "minimum treatment

---

[9] The definition states that "minimum treatments include: (a) The entire road will receive

requirements" explains that "it is the intent *in many cases* that the reclaimed road no longer function as a road again." AR 56219 (emphasis added).

Friends claims that the ISS roads do not meet the definition of a "reclaimed road," and therefore should not have been excluded from the road density calculation. According to Friends, this is because the Forest Service's intent in placing these roads into "intermittent storage" is clearly to use the roads again in the future. Furthermore, the Forest Service's proposed treatment to the roads—to place them "in a self-maintaining condition"—is inconsistent with the "minimum requirements" of a "reclaimed road."

The Forest Service argues, in essence, that Friends has taken a selective reading of the EA. The Forest Service concedes that the EA defines ISS roads as "roads closed to motorize traffic that are placed in a self-maintaining condition," AR 60378, but argues that the EA also explains that the ISS roads will meet the definition of a "reclaimed road" and proposes numerous treatments that would accomplish "reclaimed" status.

_____

treatment such that maintenance or entries to maintain "road drainage" is not needed. . . . (b) The first portion of the road (typically 200 to 600 feet) will be treated in such a manner so as to preclude its use as a motorized or non-motorized travel way. This will include: (1) making the road junction area unattractive as a travel way, and (2) treating the remainder of the first portion to make awareness of the road improbable and preclude motorized or non-motorized use. (c) Treat the road, other than the first portion, in a way that will discourage its use as a motorized or non-motorized travelway . . . . (d) It is the intent in many cases that the reclaimed road no longer function as a road again . . ." AR 56218–19.

The Court agrees. In subsequent sections, the EA provides considerably greater detail on its proposed treatments. In Table 16, the EA explains that:

> Stored roads (ISS) will be thoroughly treated so that they are completely impassable to motorized vehicles and meet the minimum criteria for a "reclaimed road" as defined by Forest Plan Amendment 19. The intent will be that ISS treatments will no longer function as roads, yet these roads will retain a road number and stay on the road system. ISS roads will continue to have a legal closure order.

AR 60387.

The table goes on to describe the particular treatments that the ISS roads will receive.[10] These proposed treatments clearly indicate that the Forest Service is aware of the rigorous requirements to achieve "reclaimed" status and is prepared to implement them.

Friends also contends that the concept of a "reclaimed road" is ideologically at odds with the Forest Service's intent in placing them in "intermittent storage."

---

[10] The table explains that "the entire road will receive treatment such that maintenance or entries to maintain road drainage is not needed. Culverts aligned with stream channels will be removed. Road related sediment sources will be repaired and road (sic) reworked to eliminate ditch water flow without the aid of cross drain culverts. Typically this is achieved by cutting waterbars into the ditch line every 200 feet. Waterbars can be placed closer or further apart depending on site specific conditions and are typically installed 50ft (sic) above grade or near existing cross drains. The first portion of the road (200 to 600 feet) will be recontoured to the original hillslope. In level topography where recontouring is not feasible[,] rock barriers or berms and placement of natural debris will be used to make the road junction unattractive as travel way and preclude motorized or non-motorized use on the remainder of the first portion of road (first 200 to 600 feet). Beyond the first portion of the road (200 to 600 feet), the roadway will be treated to discourage use including sporadic placement of natural debris where available and seeding or planting to encourage re-vegetation." AR 60387.

According to Friends, this indicates that the Forest Service intends to use these roads in the future.    Friends argues that this is incompatible with the notion that a "reclaimed road" is one that will never function as a road again.

However, it is not a requirement of a "reclaimed road" that the Forest Service never intend to use the road again.    Subsection (d) of the "minimum requirements" section states only that it is the "intent in many cases" that the reclaimed road never function as a road again.    This leaves open the possibility that there are some cases where the roads may be intended to be used as roads in the future.    Nonetheless, the crucial characteristic of a "reclaimed road" is its lack of functionality, not its future purpose.    The definition makes clear that a "reclaimed road" is one that "has been treated in such a manner so as to no longer *function* as a road or trail."    AR 56218 (emphasis added).    The ISS roads therefore comply with the definition of a "reclaimed road" because post-treatment they will no longer function as roads, and will remain roads in number only.    For this reason the Forest Service's determination that the Project complies with Amendment 19 of the Forest Plan was not arbitrary and capricious.

Lastly, Friends argues that the agency's exclusion of ISS roads from its road density calculations constitutes an abrupt change in position or policy, and therefore violates NEPA.    The Court was unable to find any clear statement of this position or policy within the Forest Plan, the Beaver Creek EA, or the Notice

-28-

of Decision.    The Chilly James EA does appear to include ISS roads in its density

calculation.    However, the Chilly James EA also proposes to treat its ISS roads

very differently from the Beaver Creek Project.    AR 61924–25, 61931.    The

Court therefore dismisses this claim.

### B. Road Density in Elk Moist Sites

Friends argues that the EA violates NEPA and NFMA because it fails to

disclose the road density standards in elk moist sites and because it misrepresents

that "no such standard exists."

The Forest Service argues that the Forest Plan is far from clear in how or

what it requires in terms of elk security.    The Forest Service explains that the

Forest Plan identifies two components of elk habitat: moist sites and security areas.

AR 52353.    "Security areas" are composed of "areas associated with the moist

sites that provide security and other necessary components of elk summer habitat."

*Id.*    "Moist sites," on the other hand, are "composed of specific habitat types,

topographic situations, and elevations."    *Id.*    While the Forest Plan requires that

"[a]reas with moist sites will be managed during the elk use period, with open road

densities that average 1 mile or less per square mile," the Forest Service observes

that the Forest Plan does not define "moist site," "elk use period," and does not set

the spatial scale at which the open road density standard of one mile per square

mile should apply.    The Forest Service argues that these ambiguities leave the

-29-

agency with discretion in determining whether the Project provides sufficient elk security in moist areas during the elk-use period.

Here, the Court concludes that the EA's conclusion that the Project's "moist areas are located away from roads and contain high elk security," AR 60754, does not clearly conflict with the language of the Forest Plan.

The EA explains that elk security (areas with brush cover away from roads) is largely present in the Project area, due mostly to the stringent road density requirements for grizzly bear habitat.   AR 60753.   As it pertains the elk, the EA provides that the Project area includes no elk winter range lands, and that "elk remain on higher elevation summer ranges until forced down to lower elevations by snow and severe weather."   AR 60752.   The EA goes on to note that the Mission Mountains Wilderness "provides high elk security during the summer and early fall months due to difficulty of hunter access."   AR 60753.   These statements form the basis for the EA's ultimate conclusion that "[m]oist areas in the project are located away from roads and contain high elk security."   AR 60754.   This is because non-winter "moist areas" used by elk are located within the Mission Mountain Wilderness, where there are no roads.

Friends is correct that the only clear road density calculation within this section states that "only 6 percent of the [Project] area exceeds 1 mile/square mile open motorized access."   AR 60753.   There is no road formal determination

-30-

made that road density in elk moist areas during the elk use period average less than 1 mile per square mile. However, because the section provides sufficient information to logically conclude *why*, the Court determines that the section meets NEPA's procedural requirements. The Court will defer to the agency where there is "a rational connection between the facts found and the conclusions made." *Native Ecosystems Council*, 418 F.3d at 960.

## III. Reconsult Grizzly Bear Subunit Policy

Friends argues that a new Biological Opinion is required to assess the effects of the grizzly bear population in the aftermath of the Legacy Lands acquisition. This argument arises in light of this Court's decision in *Swan View Coalition v. Weber*. While the Forest Service initiated consultations to "revise the implementation schedule for [Amendment 19]" in 2009, it was not completed until 2014. At that time, the 2014 Biological Opinion assumed that the 19/19/68 objectives would not apply to the seven newly acquired grizzly bear subunits. The Court's opinion has since changed that position.

The question is whether application of the 19/19/68 objectives over the seven new grizzly bear subunits constitutes "new information" triggering a mandatory consultation under 50 C.F.R. § 402.16 (b) to (c). The Court concludes that it does not. "Reinitiation of formal consultation is required" when:

(b) new information reveals effects of the action that may

-31-

affect listed species or critical habitat in a manner or to an extent
not previously considered;
(c) the identified action is subsequently modified in a manner that
causes an effect to the listed species or critical habitat that was not
considered in the biological opinion[.]

50 C.F.R. § 402.16

The Court notes that even though the 2014 Biological Opinion erroneously

excluded application of the 19/19/68 objectives across those subunits, the road

density and security core calculations within those subunits were expressly

considered with the baseline road conditions.    AR 10294, 10303–04.

Additionally, the Biological Opinion assessed the effects of these seven subunits

on grizzly populations by assuming that they would be managed in accordance

with the general Forest Plan standard that there be "no net increase in [open or total

motorized access density" and no decrease in security core.    *Id.*    As previously

noted, this is the minimum requirement of any action on forest service land, but it

certainly does not preclude an action from going further—that is, from moving the

project area closer into compliance with the 19/19/68 objectives.    Further

improvement within these subunits was expressly contemplated.[11]    For example,

---

[11] The Biological Opinion expressly describes the need for improved management within these
subunits. It states,

In the 14 Subunits with intermingled ownership, cooperative
agreements with other landowners are necessary to promote
improvements in habitat security over areas the size of one or more
grizzly bear home ranges. I [Forest Supervisor] am actively involved

the effects of decommissioning 8.4 miles of road within the Glacier Loon and Buck Holland subunits as a result of the Glacier Loon Project was considered to "improve" the conditions within those subunits, moving them closer into compliance with the 19/19/68 objectives.    AR 10302.

After the Court's decision in *Swan View Coalition v. Weber*, the Forest Service informally consulted with the U.S. Fish and Wildlife Service to determine whether application of the 19/19/68 objectives required a new Biological Opinion. The determination made at the time was that the seven subunits were sufficiently addressed within the 2014 Biological Opinion, and it was therefore not "new information."    AR 61095, 1896.    Though this decision itself is not conclusive of the issue, it further assures the Court that that the application of the 19/19/68 objectives and the need for further improvement in decreasing road density and increasing security core was adequately considered across all subunits and is therefore not "new information."

Thus, the Court concludes that the agency was not arbitrary or capricious in failing to initiate a new Biological Opinion to account for the transfer.

---

in efforts to develop such an agreement with major landowners in the Swan Valley . . . these efforts to develop cooperative agreements are critical to assure a recovery of the Mission Mountain grizzly bear population and the long-term conservation.

AR 10296.

Having reviewed all of Friends' claims,

IT IS ORDERED that Defendant's Motion (Doc. 12) is GRANTED.

Summary Judgment will be entered in favor of the Forest Service.

IT IS FURTHER ORDERED that Plaintiffs Motion (Doc. 8) is DENIED.

DATED this 16th day of July, 2018.

Dana L. Christensen, Chief Judge
United States District Court